Foya or Tafolla, I'm not sure of the pronunciation, versus Heilig. So Mr. Bergstein, before we start, pronounce your client's last name. Tafolla. Tafolla, that's how I do it. Okay, well, you know better than we do. All right, so you have ten minutes, but you reserve three minutes for rebuttal. Correct. So you may proceed. Okay, we have two reasonable accommodation periods relevant to this case. The first one involved plaintiff's office interaction with Joseph Carroll on January 7, 2014, when we argue the jury can find that defendants violated the ADA when Carroll ordered plaintiff to archive the closed files because the order contradicted the medical note that plaintiff's doctor prepared a couple days earlier. Let me ask you about that, Mr. Tafolla, because as I was reading the briefs on this, it just seemed like this case- He's Bergstein. I'm sorry. Bergstein. You got Tafolla in my head. This case seems to be a disagreement over what the doctor notes said. It seems to me that they were willing to accommodate her, but their view was that she could file folders unless it was more than five pounds. And there was some confusion about that. She's telling them, no, I can't do any filing, archiving. And their position was, no, your doctor says as long as it's under five pounds, you can do it. Isn't that really what this- Well, I wouldn't use the word confusion because if you look, there was sort of a misapprehension maybe of what the doctor's note said, but if you look at the doctor's note, it's pretty clear, page 980, no lifting over five pounds. Well, the second one is less clear, though. The second one, the 983 one, says she's unable to lift, bend, twist, or push any object over five pounds. You know, that's an interesting point because the second note slightly modifies what the doctor said from the first note. The first note separates out. You have a five-pound limitation and separate and apart from that- I agree with you. The first note is clearer because it says no bending, pushing activities. Right. So that's not in the context of five pounds. The second note, if you look at it very carefully, it sort of compresses everything. It's a bad word for a back point. Their position is that your client basically, this is what the interactive process is for, that if there's some confusion about what the doctor is saying, the Hellig memo is basically saying, we're going to give you whatever accommodation your doctor tells you, but it seems to me that they're just confused. They're thinking that she can do archiving under five pounds. Let me just finish my point because I want you to respond to this. Their argument is by your client just stopping, coming to work, that she eventually withdrew from the interactive process to try to resolve this. What's your response? Okay, let me respond two ways. Like I said minutes ago, there's a two-part to this case with the reasonable accommodations. You know, we can win on the interaction she had with Carol even if we lose on the thylake note. And I think it's clear that a jury can find that Carol's directive violated the plain terms of the first doctor's note, and she told him that. So that's the interactive process, and he said, I don't care, do it, or you can't work here. So that's the first part of the claim. Are you arguing that an accommodation has to happen in a certain time in order for it to be valid? I mean, I understand why as a legal strategy you want to have two different accommodations, but do we have to find that? If we find that it's one that was continuing and evolving, can we still find for your client? I think so, but I don't think a jury has to separate it out that way because she was injured from the first reasonable accommodation denial on January 7th because she did what she was told and she further hurt her back, and she wrenched her back by twisting and bending and she wasn't supposed to. So the jury could say, we find for plaintiff on that. Now let's take a look at the second reasonable accommodation period when the doctor issued another note, which is slightly different from the first note. The problem with the second note is that it's contradictory, and the second paragraph says the county doesn't have light duty. That's not really true. We have testimony that there is light duty, and that if you're not capable of performing your duties for any reason, you need to come in with a doctor's note, quote, indicating that you can work with no restrictions. What does that mean? That means no accommodation. You either work or you don't work, even if it's not an essential job requirement. That's the problem with the High League note from January 16th. It has this contradictory second paragraph with an all or nothing directive. If you can't work with restrictions, you can't work here. That's the problem. And she said, no, I need restrictions. Archiving is not an essential requirement. I don't need to archive to do my work. I can do sedentary work like my doctor suggested and still perform my duties as a secretary. That's the problem with the second note. So to answer your question, she can win on one part of the reasonable accommodation plan. They're going to say that the Hellig memo says that we're going to give you every accommodation your doctor tells us we should give you. And then beyond that, I think they're saying you're not entitled to any special treatment or light work. Isn't that what the Hellig memo says? No. It says these accommodations. It's talking about what the doctor, and again, they're confused, I think, about what the doctor is saying. But they say these accommodations allow you to perform secretarial work as a clerk typist, consistent with the conditions set by your doctor in the January 8, 2014 letter. So they're not saying we don't care what your doctor says. In fact, you said that Carol said to her, I don't care what your doctor note says. But your client in her deposition said that Carol told her that the doctor's not saying that she can't do any filing. So Carol wasn't saying I don't care what your doctor says. Because according to your own client, Carol said that the doctor's note says you can't do filing over five pounds. So, again, I just think this is an issue of the interactive process and the back and forth and who's responsible for that. Carol conflated the conditions in the first note by assuming she can do anything if the file is less than five pounds. And she said no. That's part of the note. I also- So he may have made a misinterpretation. I think Judge Bianco is saying that he may have done that. Yes. He gets the second note to try to clarify, to try to tell Carol, look, you're wrong. I can't do any filing. But the second note is not perfectly clear either. No. It's actually worse than the first note in some respects. Because the second note, the first paragraph is fine. The first paragraph, if he left it alone, that's fine. I don't know. That's not a great- Well, it's- When it says she's unable to lift, bend, twist, or push any object over five pounds, to me that's not great. Because the question is are you just talking-when you say bend, are you talking about in relation to objects of five pounds? Because it doesn't make sense. You don't twist something that's five pounds. I understand that. I understand that. It's just not a great sentence. So- Well, then we're getting to sort of the heart of our argument here. Either it's a bad letter or it's something else. We're now getting into the fine points of intent and reasonable accommodation. A jury could say, well, this letter by Heilig, you know, the second paragraph undoes any good that he gave her in the first paragraph by saying a doctor's note indicating you can work with no restrictions. That suggests we're not giving you an accommodation unless you're perfectly able to do anything we want. That's the problem. We're talking summary judgment here. Let the jury determine whether it was a good faith mistake by Heilig. These are lawyers, by the way. These are not an HR department that doesn't know what it's doing. Or the jury could say, wait a minute. They simply don't want to give out reasonable accommodations. Can I ask, is your position that the only reasonable accommodation was relief from all archiving responsibilities? That's a huge part of it. I'm sorry. So you're saying that there was only one reasonable accommodation. And it was relief. No lifting over five pounds and no bending, twisting. But this is all in the context of archiving. And that's how it all started with archiving. I'm sorry. This is actually important to my thinking. You are taking the position that there was only one reasonable accommodation, and that was no archiving. Right? I think so. And that's where the case is. Does that mean if we find that archiving was an essential function of her job, we can't rule for your client? If you find archiving is an essential part of the job, then we're going to have problems. But because that's really what the issue was during this brief time period. Well, have you noticed that it's unusual to be in a posture where there was only one reasonable accommodation? Right? I mean, you can appreciate from an employer's perspective based on their history that there's usually a few, and they're trying to figure out which ones work. I don't know. So is there any precedent for there only being one reasonable accommodation, and that's relief entirely? Since that issue wasn't briefed, I don't know if there's precedent on that issue. But if we look at the facts here, she was a secretary. It's primarily a sedentary job without any real physical responsibilities. You're answering the phone. You're typing. You're doing whatever. The one physical responsibility would be archiving. So I think in this instance, that would be the only real accommodation here because we have testimony that other people can archive too. It's done very sporadic. It's not a pressing concern. Even Carroll testified when he was asked if he thought archiving was essential. But there's no doctor's note that says no archiving. That would be simple enough, but there isn't one that says that, right? Right, but the no lifting over five pounds, no bending, twisting, it sounds like it's geared toward the one physical responsibility she had working in this office, which is archiving. Well, it sounds like it, but that's the reason why we have a process that is required to bring the parties together. And she did say to Carroll, I can't do this because my back is killing me, and my note says there's no twisting, there's no bending, forget about the five pounds for a minute. What are you doing? And he says, just go ahead and do it. She did it, and she hurt herself. But it seems to me what you're arguing then is that he's got a second to decide whether he's going to give her a reasonable accommodation or not. And if he doesn't, then she's got a claim. He's got a what? Then she's got a claim. No, I missed the first part of the question. If he doesn't on that split second say, okay, you don't have to archive today. Well- And that doesn't seem to be what the interactive process is about. Well, she responded to his directive, and that's the interactive response. She says, no, I can't do this. Then they had a back and forth of 10, 15 minutes. He starts yelling, and he's carrying on, and he basically says, just do it. She's trying to explain, no, my doctor's note says otherwise. That's the interactive process. I mean, they're in the middle of the workday. He wants her to do something. I mean, I guess there's other ways to have an interactive process. You can put everything aside and think about it for a week. But here we are in the middle of a directive, and she said, take a look at my note. And he had the note, and he could say, oh, you're right. I can't have you do this. I'll have somebody else do it. Instead, he said, just do it. She did it, and she hurt herself. That's the problem. Thank you. All right. We'll hear from Ms. Gabor. Am I pronouncing that right? Gabor? Yes. Good morning, Your Honors. May it please the court. Excuse me. Just lower it. Lower it. They can't see me. Okay. Good morning, Your Honors. May it please the court. My name is Hope Gabor. I'm an assistant county attorney with the county of Suffolk. And I represent defendants and police. There was a plainly reasonable accommodation that was offered to Ms. Tufola. When? Well, we argued that both times, it was. The first note says she's not to lift, bend, or twist anything over five pounds. No, the first note says no lifting over five pounds within a separate line. It says no bending, pushing activities. So her position was that that meant no bending means no archiving. Mr. Carr obviously took a different position, but why isn't that an issue? I don't believe it's an issue. I don't believe the archiving would necessarily involve bending or twisting. You can archive without bending? Absolutely, Your Honor. A box can be placed on a desk. And then how do you put it away? That was not her job to put it away. Tell me what archiving is. Archiving is taking a file, closing it out on the computer, placing it in a box. And she's not to lift the box. She was told by no one certainly not to lift the box. She's not to lift the box. She was told if it was over five pounds. She wasn't told not to lift the box. Not even under five pounds. It's not her job to lift the box. Mr. Carroll was pretty clear that she was required to lift if it was less than five pounds. The files, Your Honor, not the box. What does it matter? A box full of files certainly would be more than five pounds. It's probably a banker's box, which is filled with a lot of little files weighing under five pounds. So probably the entirety of the box would weigh more than five pounds. What about the time you told her to pick it up off the floor? Not the box, Your Honor. I know, but her position is no bending. No bending of any type. That's her position based upon the note. I understand. So why did the employer, if they're going to defy a doctor's note, either have an obligation to go back to contact her doctor as to get another note, rather than just tell her this is the way we interpret a note. Either you accept this or you go on medical leave. Why is that not a problem for the county? Well, it's not a problem for the county, Your Honor, because right after that, Mr. Carroll did have a meeting with all the ADAs in the office. And he was very firm with stating that Ms. DeFolla is not to touch anything over five pounds. And said if anything is involved in that, she is not to do it. So can I ask the same question that I asked her colleague? If we treat this as two offenses rather than one, where are you more vulnerable in your opinion? Probably the first one. And that is because of the no bending, right? I think there's some confusion with what that actually meant, if that meant no bending concerning the five pounds or not. But the second note from the doctor did confirm no bending, twisting, pushing, any object over five pounds. Right, but that's also a different point in time, right? It doesn't have to be a confirmation. It could have been at one point in time she saw the PA that said, your injury is really fresh. Let's see how you're doing. Right now you have some restrictions. And then in a future time, we are looking at what those restrictions look like now, right? They don't have to be a confirmation, right? It could be she had a limitation and then she had a different limitation because time had passed. That's correct. Okay, so if that's the case, then why didn't you violate the first limitation of the doctor? No. I don't believe it was violated, but assuming arguendo that it was violated, the second accommodation was clearly granted and it was plainly reasonable. The second doctor's note said no physical, it was that sentence that kind of strung things together. But then the following sentence says no physical duties at this time. She's only to perform secretarial work, but no physical duties at this time. So, again, why isn't that another confirmation that she can't do any archiving? I think that's very much open to interpretation. I know, but doesn't the employer have an obligation at this point? If you're going to tell her you've got to go on medical leave, we think this means you can archive, why don't they tell her we want a note from your doctor that says, as Judge Sullivan pointed out, no archiving. You can't do any archiving. Wouldn't that be what an employer should do if there's some ambiguity in the doctor's notes? Rather than tell her this is the way we interpret your doctor's note, you either accept this or you go on medical leave. Isn't that not the way an employer should handle this? Well, the problem is, Your Honor, she walked off the job on January 15th. She put in the second reasonable accommodation request on January 14th. It was not responded to until January 16th, unbeknownst to Mr. Heilig or Mr. Carroll, that she left the job never intending to go back. So there was no opportunity for the county to ask for- Well, except the January 16th one essentially mirrors what the county's position was all along. You would have a much better position if the January 16th memo said, we want to make clear, we're not going to make you do any archiving consistent with your doctor's notes, and then she never came back to work. They wouldn't have any case, I think, because you would have gone through the interactive process and confirmed that you're telling her no archiving. But this essentially says you have to do archiving under five pounds or you have to go on medical leave. Isn't that what the Heilig memo says? No, I don't believe that's what it says. It says you are accommodated to the letter of your doctor's orders, and it quotes the doctor's orders. Don't put any file weighing over five pounds in the performance of your work as clerk typist. So she's reading this, she's like, they're still saying I have to do archiving under five pounds. And then in the last paragraph it says, if you're not capable of doing this, you need to go on medical leave. So she went on medical leave, and you're saying, no, she should have come back to work. I'm saying she should have responded to the letter and continued the interactive process, which she did not. Well, wait a minute. What about them not responding to her December 6th email until January 7th during a terse conversation, right? I mean, him asking about the backlog is not responding to her December 6th email, right? Well, the email was responded to immediately, Your Honor, where Mr. Carroll wrote back and said, I don't want you to hurt yourself. Let's see what your doctor says. Please provide me with a note. Right. So why is that not saying we're not going to give you the accommodation that you want? That didn't say that at all. It said, let's see what happens, let's see what the doctor's note says. Okay, so that is, I am not giving you an accommodation until I get more information, right? No, he basically said, don't do anything. Don't lift anything, don't do anything. I don't want you to hurt yourself. Don't do anything until we get a note from your doctor. Can you give me the best argument you have for why archiving was an essential function? Oh, sure. All of the clerk typists do the archiving. Mr. Carroll testified to that. Mr. Hiley testified to that. The ADA that was deposed as well testified to that. There's no one else that does it. Okay, so the best argument you have is they all do it? It's the job title of a clerk typist. They say it's not in the description, though. It's not in the job description. What is in the job description, though, Your Honor, is does related work as required. Does related work as required. I'm looking at Joint Appendix 990. And sorts, indexes, and files, documents, reports, correspondence, and other material. It doesn't have to be all inclusive. Case law states that it has to do with practice in the workplace, and other factors are considered. It doesn't have to be all inclusive. Also, I think they cited, I don't have it in front of me, someone's deposition. Carol said it's a very minimal part of the job. I think what he meant by minimal was that there were more important things that have to be done. So was archive the last thing that had to be done? Sure.  Well, but if it's the lowest priority, then how does that make it essential? Well, because when files are closed out by the ADAs and they're placed to be archived, they were just piling up and piling up and piling up. But that's not the same question. The same question is, as I heard you, you're saying that the best evidence, or the best argument you have for that it being essential is that there's a custom of everybody doing it. That's correct. But note that the district judge didn't find one way or the other whether it's an essential function, right? She did not get to that point because she determined that since the accommodation offer was plainly reasonable, she would not have to get to the point of considering whether it was an essential function of her job or not. So do you think that we should be doing that here based on the record? I'm going to ask your adversary the same question. No, Your Honor. No. Well, I do believe, I do argue it is an essential function of the job. And I do support that in my deposition testimony. And by plaintiff's own testimony, she's the one that instituted the interactive process, stating only for archiving, I can't do the archiving, I would like somebody else to do it. So the interactive process was started by her specifically concerning archiving. Obviously, she thought it was an essential function of her job. Otherwise, she wouldn't have even addressed it. I don't really understand that argument. When someone requests an accommodation, they're conceding that it's essential to their job. They could be being told to do something that's not essential, and they're objecting to it because they have a disability, right? That can't be. She knew archiving. That was done by every clerk typist in the DA's office. That was just a function of her job. All right. All right. Thanks very much. We'll now hear from Mr. Bergstein for three minutes of rebuttal. I think this court can decide that the issue of archiving is for the jury because we have testimony that points in our direction, and Carroll didn't simply say it's rather minimal. He was asked, is archiving essential? He said, quote, I don't know if I would deem it essential. It's rather minimal. That's page 590 to 591, and it's not in the job description. I mean, of all the things that go on in a law office, and we all know what goes on in a law office, putting old files away in a box if you don't have a bad back is probably the least burdensome thing. I would think that's pretty basic for what you'd expect for a secretary or an assistant position. Except that everybody seemed to testify it's done. She said it's a very small portion of the job. Yeah. I mean, it may be temporarily a very small portion of the job. Well, it has to be. But who does it otherwise then? Other secretaries. Do lawyers do it? Other secretaries do it. The fact that other secretaries do it means they're saying that it's not essential, right? But then we're suggesting that everything that goes on in an office is essential because everything ultimately has to be done. If this is a function that only secretaries do, that would seem to be an argument that it's essential to the job of being a secretary. In other words, it's not lawyers doing this. It's not paralegals doing this. It's not supervisors doing it. So, look, I'm not sure there's enough in the record for us to decide this now, but I'm asking, I guess, both of you. Do you think that there's enough in the record for us to determine whether or not this is an essential part of the job? Yes, based on the citations in the brief and the testimony, but it's very sporadic. It's the least important task. It's rather minimal. No pressing nature when it comes to archiving. It doesn't have to be done now like a subpoena. Somebody testified to that. It's not an essential. It doesn't sound like an essential function even for a secretary. And there's other secretaries who can do it. It may be relatively simple work if you don't have a bad back. But she couldn't do it. But somebody else can do it. And so if it's not pressing for the reasons I mentioned, and they're in the brief, we brief this issue. I think a jury can find, this court can say that a jury can find that archiving is a non-essential function. You haven't covered your retaliation claim. Can you briefly? The retaliation is almost identical to the second reasonable accommodation argument. What is the best evidence in front of us that the defendants forced the plaintiff? Is it the same as they didn't give her the accommodation? Yes. She sees the Heilig memo. The memo says ultimately in the second paragraph you can't work here if you have a medical limitation. She reads that to say I can't work here until I get better. And that's the retaliation. And we're getting into intent. And intent is always an issue for the jury. But why is that language in the second memo? That's the problem. The retaliation for what? For not working? For simply bad office management or bad memo writing. But if the jury reads the second, the Heilig memo, the jury could find, well, this was a retaliatory measure. She had already made an issue of her reasonable accommodation. She came back for another one. And they give her an unreasonable response. That's retaliatory. And an involuntary leave can be an adverse action. The judge did say that. Okay. Thank you. We will adjourn the decision. Thank you very much. That brings us to our last case on the argument calendar today. It's Haslinger v. Westchester County. Thank you. Thank you. May it please the court. You're not, I think, set. Yeah, I'm a clock. Sorry. So just hold on, Mr. Padilla. All right. So, Mr. Padilla, you have ten minutes, but you reserve two minutes for rebuttal. You may proceed. Yes. May it please the court. My name is Alexis Padilla, and I represent the appellant, Kenneth Haslinger. Your Honors, the constitutional, appellant's constitutional right to be free from conditions that pose an excessive risk to his health and safety was violated. Where jail officials recklessly put him in the same housing unit with a person who they knew or should have known posed an excessive threat to his safety. How did he know he posed an excessive threat? All he said was that he had a little beef, I think is what he said, right? That's what he told Officer Hayes. He was asked if there was anyone who posed a threat to his safety. He then said, yes, I have. He used the term beef in his deposition. It's unclear if he used that exact term when he was speaking to the intake officer. But even if he said to her, I have a beef, a beef is a street term for an ongoing dispute. If a person has an ongoing- So the assumption should be that this is someone who is going to physically assault you? When the answer to the question, is there someone who poses a threat to your safety, is yes. And you give a full name and you say, me and this person have a beef. And I would also note that there's language in the record that indicates that he said that he had been threatened by this individual. Where is that? I didn't see that. That's in the assistant warden's grievance appeal denial letter. That's appendix 132. He says that as far as the incident you told the officer you felt threatened by a person who was not incarcerated in our facility at the time you were processed. So that being part of the record, he gave a full name, he said I have a beef with this guy, and he said that he'd been threatened by him. I don't know how he can be obligated to have to give more. It occurs to me that there's a point where it runs up against his right to not incriminate himself, right? I mean, in this instance, he's coming into the jail on a domestic violence case. The person threatening him is related to the alleged victim in the domestic violence case. If he has to give a full, in-depth, detailed- You don't have to give a full in-depth. You could say this individual has beat me up in the past. This person has threatened me. I'm going to ask your adversary about this reference to feeling threatened. But you don't have to give every detail to say something more than I have a beef or dispute. Even if you consider that to be a street term, I think you would be suggesting that anyone then could walk into a prison, could get a whole list of people that they have, quote unquote, beefs with. And the prison, in order to avoid a 14th Amendment violation, would have to put all those people on the 20 people. These are the 20 people who I have beefs with on the outside. If they ever come into the jail, I don't want to be with any of them. And you would say it would be a 14th Amendment violation for them not to put all 20 of those people on a list? No. I don't know that that's what happened here, though. There's degrees of beef, right? I know, but he didn't articulate the degrees of beef as far as I can tell from the record. And if you want to sue them for a 14th Amendment violation, your client has to have put them on notice that it wasn't just a beef, but that it was sufficiently serious that it would warrant a separation order. That's the standard for deliberate indifference. So, I mean, I guess another way of asking Judge Bianco's question is, was there any evidence that the intake staff knew that his family had been threatened, they had been stalked, it was over a woman? Is there any evidence that that was in front of who was doing intake? No. Mr. Hasslinger did not testify at his deposition that he offered that type of information. So how do we have a limiting principle that does not overly encompass things that aren't severe threats with something that is? I mean, I think there might be a line where we can say they were given enough notice, but I'm asking for help from you because we would have to write something where that line is. Well, I think what's key here is that he was asked within the context of the intake process. He's asked by a jail official specifically, is there anyone who poses a threat to your safety? Okay, but they ask that for everybody, right? We need to know, and again, I'm asking for help. Like, if we write something, we have to write words down that provides guidance to people. What is the limiting principle? Is it just enough to say I have a beef with someone or does there need to be something more? I think there's something more here is that he gave the full name of the individual. I think the case law that refers to vague and stale threats, if you look at those cases, they generally refer to situations where- Just because he gives a name doesn't mean it's a serious risk to him. I gave you an example of 20 people on the outside, but let's take the people on the inside. Suppose a guy comes into the jail and says there's 25 people in the jail who I don't want to be put with. I feel, in response to your question of who poses a threat to my safety or who I feel threatened by, these are the 20 individuals. Your position is him naming those individuals and saying I feel they jeopardize my safety would require the jail to put 25 people in the jail on a list that he has to be kept separate from. Isn't that what you would be saying to us? I would say that happens all the time, your honor, in the context of gangs. Okay, but that's an additional detail, right? If he had said I have a beef with this guy, he's a member of a rival, he's a member of a gang, then that's a different argument. But we don't have him saying this individual that I'm giving the name of is a member of a gang and he's violent and he's threatened me or he's beat me up in the past. We don't have any of that. We don't have any mention of a gang, right? What we have here is an individual who had threatened my client on social media. And my client- No, no. It's really what is in the record to indicate what was said to Officer Mays at the time of intake? Well, that's in Opponent's deposition that he said to Officer Mays that they haven't had any physical altercation in the street, that the threats had occurred through social media. Respondents have used that to kind of downplay the threat as if in 2023 people don't make very real threats over social media. I mean, this is no different today than picking up the phone and calling someone and saying, you know, making a threat over the phone. If someone calls you and makes a threat over the phone, you take that seriously. I don't see how it's any less serious just because someone did it over Facebook or the Internet. I think what we're arguing or what we're trying- we need some help from is how did they know how severe the threat was? Like, what was it? And it seems to be that your position is the mere utterance of it is sufficient. It is. It is because in the jail context, first, people don't ask for protective orders lightly. Keep separate orders generally will mark you in jail, right, as someone who is asking for protection. It's a step below asking for protective custody. In the jail culture, generally people don't do these things. So when in response to the very specific question of is there a person who poses a threat to your safety, a person says yes and gives a full no. I just don't understand how a jail needs more in order to be on notice that there's a threat to this person's safety. Where in the record did he testify that he told Officer Mays this person had threatened me on social media? Do you know where that is? I didn't see that in the briefs. If you look at the 56.1 statement, that's Appendix 141. Right. It says that paragraph 11, the arguments that plaintiff had with Mr. Rooney prior to being incarcerated at the jail were not in person but via telephone and via Facebook. Okay, but that doesn't say that he told that to Officer Mays, right? Yeah. Well, that's based on his testimony from the deposition transcript where- And that is what I told Officer Mays. Just to go back to Judge Sullivan's point, that's the critical factor on deliberate indifference. Not what the history was, but what was told to Officer Mays. Sure. Are you sure in the deposition that he said I told Officer Mays that I had been threatened on social media? Or is that just him describing his own background with the person? I think, to be honest with you, Your Honor, at the deposition, he didn't really remember what he had said specifically to her. And that's part of the issue with this term, street beef, right? Because he uses that term at his deposition. That's the first time that it comes into the record, right? The most contemporaneous description of what he said to her is actually in the grievance denial letter where it's acknowledged that he told her that he had been threatened. I say I see he had problems, right? On the issue of whether it's a policy or not, obviously Officer Mays is not a policy maker. The policy seems to be ambiguous, saying you're not required to do this, but it doesn't say don't do this. So what's your response? In order for you to prevail here, you'd have to establish the policy, right? Again, I would point to the denial letter, the grievance denial letter, where he says the department had no way of placing a keep separate with someone who is not presently incarcerated in our facility. That comes from the assistant warden. I would say that this is the kind of case that Monell exists for because- It only exists if, look, if a prisoner gave chapter and verse about who posed a threat, said they may not be here now, but they might be in soon, and I'm telling you, you've got to keep me separated from this person because I'm a dead man. If they give that kind of detail, then that's a different story about deliberate indifference based on this policy of not putting in separations based on people who are not yet in custody. But we're focused here really on what it is that Mays has knowledge of that would put her on notice that there needs to be a separation here. She knows that there's an ongoing dispute? So I'm looking through the records and I don't see what you're referring to about the social media statement. I believe the transcript citation at page 53, lines 17 through 19, where he talks about Facebook, threats made on Facebook. In any event, she knew that there was an ongoing dispute, and she knew that there was a threat, and she knew the individual's full name. And within context, this is a guy telling her, I need to be kept safe from this person. While coming into a jail, this is not his first time in a jail, right? He's actually there on a hold on a federal probation violation, right? This is not his first time. He's been incarcerated in federal prison. He's been incarcerated in state prison, right? He's been to jail before. She knows that from looking at his intake information. When he tells her, yes, there's this person who I'm very much afraid of and would like to be kept separate from, what more does he need to say? I just don't understand. What if he had done something illegal to this person, like assaulted him or something like that? And the whole reason that he needed to be protected is because the guy was out for retaliation. Is he supposed to admit to the intake officer that he shot the guy or that he stabbed him once and that the guy wants revenge now? Well, I guess the issue is what is deliberate indifference on the part of an officer. And you, I guess, are asking us to adopt a rule that anytime somebody says, hey, I gotta be separated from this person, that prison officials have to take that at face value, and if they don't, then they're going to be liable for a 14th Amendment violation. I think where they're told that there's a threat to the safety. It's not, if a person comes to a prison official and says, I need to be separated from this guy- But they can't inquire, I think is what you're saying, that it's enough for the person to say it. They can- It has to be acted on. They can inquire, I just don't think that the person is obligated to tell them anything more than, this person has me under threat and I need to be protected from them. I mean, I just don't understand where they're entitled to more. All right. Okay, well, you've got two minutes for rebuttal. We'll hear now from Mr. Aiden. Am I pronouncing that right? Yes, Your Honor. Okay, Mr. Aiden. Good morning, Your Honors. May it please the Court. Justin Aiden for the County of Westchester. You asked where the court, how the court draws the line in this case, and this court has already. The Morgan decision, I think, clearly delineates the difference in what information is necessary. In Morgan, you had an instance where an inmate was assaulted, and you had two different classes, essentially, of defendants and correction officers. There was one group who the inmate went to right before recreation and said, that inmate over there threatened me. I think he's going to beat me up during recreation. I need to be kept separate. They didn't do anything. He was beaten up during recreation, and this court said the threat was not specific enough. There was not specific enough information, and those defendants were dismissed out on summary judgment, which this court affirmed. You had a separate group that knew the inmate who got beat up had said, at my prior facility, I cooperated with prison officials about gangs. This guy's in one of the gangs I gave information on. He's threatened to beat me up for being a snitch. There, there was specific information underlying the threat, and this court said they're still in. That case goes forward to a jury. So that line has been drawn already. There has to be specific information. I'm baffled about this policy of not separating folks or not having a flag. In this courtroom, when we list a matter that we're recused from, we don't then have to go do it again. Why is not having a computer system that can flag problems that are very typical to other computer systems that we see in the other world enough in this case? Well, what I can say from what is in the record is that there was an ability, and they did enter a note about the allegation that there was a beef with this other individual. Now, he's not in the jail at the time, so essentially to keep separate is the fact that one person's in jail and one person isn't at that point. So basically you're saying that if you have a street beef with someone, you better hope that you're the second person arrested, right, because the jail will have a policy of washing their hands from the obligation because they don't have a separation policy for you as long as one of you is out at the time that it was recorded in the intake. I'm not saying that it's impossible to have a situation, but where the only thing is I have an issue with somebody in the outside, it's not necessarily enough. It seems like from what you're saying, though, is that there is no way to separate someone prospectively to put something in the computer, and he points to the denial letter, which essentially he says that we don't do this. And maybe there was a note put in the system, but obviously that note didn't prevent them from being put together, right? So is there an ability to separate something, put a name into the system? So let's say he had said this person's in a gang. They beat me up previously. Does the jail's computer system allow them to make sure that when that person comes in, they're going to be separate, or it does not? I don't know the answer to that, unfortunately. That was not something that really came out during discovery. What came out was this has never come up before, so it's entirely possible that the grievance coordinator said you can't do it because he assumed we couldn't because we haven't done it before, but nobody is aware of anybody ever asking for keep separate with somebody who wasn't at the jail already. Well, I mean, how is someone in intake supposed to know who is in jail? They can look them up in the system, and that's what happened. What I'm saying is how is the requester supposed to know? When the requester says I have a concern with someone, I have been threatened by someone, their name goes into this field that apparently is completely meaningless because you all have a policy or the county has a policy of not separating them unless they are both, unless the complainant comes in at a later point in time, how is that not indifferent? Well, it's not. So the requester, when they come in, they may not know if somebody is in jail or not, but that's why they say this is somebody I have an issue with, and part of the process is they do look up. They will look them up to see is this person actually here or not. What about the fact that the intake officer was told that this person is likely to come in? What about that? Well, I think it, again, goes to the fact that there's not any credible, there's not any real information about the threat even if they're, even if. Well, so I think there's two issues we have to grapple with. One is the existence of a policy that does not keep people separate if the complainant is the first one or the person who feels threatened is the first one in, right? That's one problem. And then the other problem was did the plaintiff in this case give enough information to put people on notice that they needed to do something, and when they failed to do it, was it deliberately indifferent? So I'm actually interested in the first part right now, like the not having a separation policy. I mean, I think, and I think that the easiest answer for that first part is if the court goes to page 141, the last page of the appendix, plaintiff admits that there's no count, that the jail does not have a non-association policy that applies to individuals who are incarcerated. Isn't that the problem? Isn't that the policy? They have a policy of not separating people. No. Okay. They do not have a policy governing this situation. So what you're saying is that if somebody came in, a new prisoner came in, and at intake said, I have a real problem with somebody, and I know he's got a warrant out for him, and he is going to kill me if he sees me, there is an ability for an intake officer to make a note of that and take preventive steps? I know from the record that there is an ability to note that in the intake system. I do not know the exact capabilities. The problem, they may note that in the inmate in front of them's file, but when the person comes in, there's no cross-referencing of that. If you put a note in this Mr. Hasslinger's file, he has a beef with this inmate, this person who's out on the street, and that person comes in, how is that note in his file going to come to the attention of the person doing intake on the person he has the beef with? Apparently it's not going to happen, right? I cannot answer that, that the extent of the capabilities of the system in cross-checking that is not in the record. Conveyed to the jail, they've got to look into that, because these hypotheticals that were presented may not have come up before, but regardless of whether there's liability here, there should be a system in place, an ability at least, when someone gives sufficient information regarding someone who's out on the street, to make sure that when that person comes in, they're not put together, right? I would certainly expect that there is some sort of capacity in the system for this, because I can't imagine, I mean you have situations where people... There's a note saying that not being in the facility could not be placed. I mean there is, at least it is being conveyed to and defended by. We don't have a means of doing that, so even when we give you the name, there's nothing we can do, because the guy wasn't an inmate at the time we looked him up. We have a statement from somebody who's not doing intake, who reviews the grievances, who says we couldn't do that. But I don't know, there was not really discovery on what the actual system itself has. I do assume there are situations where there's gang violence and people get arrested. Who's Francis Del Grosso, the assistant warden? He's an assistant, yes. The department had no way of keeping, of placing a keep separate with someone who was not presently incarcerated in our facility. Why isn't that a policy, right? Why isn't that saying we do not, we are unconcerned with street beefs if the person who feels threatened is the first person arrested or detained by us? It's not saying that we do not have a method to track and to make determinations when somebody comes into custody. It's at best saying we don't have something that says keep this person in jail away from this person who's not in jail. I don't know how that cuts against you, because now I'm hearing, I thought you guys were going to say you couldn't do it, and so therefore we weren't deliberately indifferent. Now you're saying we could do it and we didn't. What I'm saying here is from the record, I do not know the exact capabilities of the elite system. It was not- Your position is even if this person were in custody, in the jail, that what he gave was not enough information to be put under this Morgan case that you're citing. Correct. You're saying it was just nonspecific enough to constitute deliberate indifference because of the lack of information regarding the nature of the threat. Correct. As Your Honor pointed out earlier, the problem is you could have an inmate come in and say, you know what, I really don't like this cell block. It's too noisy. It's too close to record. I've got a problem with these people here, this guy right here. Here's his name. He threatened me. No, no, no. Judge Bianco asked you a fair and sensible question. That is a preposterous response. There is no way that somebody would know which cell blocks were problematic before they got in. We have a hard job that we're trying to do that's being very, very dismissive. Can you please answer the question about whether or not we have, whether or not being told of a mere threat in this instance was enough, and what do we do about the fact that they knew of the threat and it's ambiguous as to whether or not they could have had a policy to do something about it or not, but they chose not to. Your Honor, the threat was definitely not, what they were told was definitely not enough, and this Court's decision in Morgan makes it clear just saying, I have an issue with this person, he threatened me, is not sufficient detail. And, you know, I would note, you know, and as counsel said, this client's been in and out of the jail. Somebody, people, we do get a lot of repeat visitors at the jail, so people do know where they are, and once they're there, they can also request keep separates as things arise during their time in the jail. But if you have a system that says, as long as they say, here's the name of somebody, I feel threatened, you have to do a keep separate, it can create a big problem if an inmate does want to move their cell block, if they want, you know, or if they want to move somebody else. Move is not an intake, right? Like move is not an intake, right? Like an intake they have not, they don't know where they're going to be. So I just want to make sure that the gravity of the decision that we're having to do is being not dismissed with cell blocks. No, I'm certainly not meaning to dismiss. I'm saying it's the same issue at intake as it is while they are in custody in the jail as to what you need to be told in order to have a keep separate. If all you have to do is come in and say, you know, John Smith threatened me, and that's it, why would that be any different if two weeks into your time in jail you say, John Smith and my cell block threatened me? I mean, there still needs to be something more, and that's what the courts have held because you have to have some basis for them to really evaluate. There was nothing here other than, you know, I have a beef. I believe Officer Mays testified, you know, he used the word street beef during the intake. There is no testimony that Officer Mays was told any details beyond that. Right. You're disagreeing, I think, with Mr. Padilla's characterization of the deposition testimony. Is that right? Yes, and I believe if you go to page 88 of the appendix, and it's what exactly did you tell Officer May, I told her I needed to be kept away because I assumed of the little beef we had from prior being in jail. That's what I told her. Why isn't that a question of, why isn't that an appropriate issue for summary judgment then, if there's two competing evidence, there's two competing versions of what Officer May knew? Because there aren't two competing versions. Officer May said he told me street beef. The plaintiff in his deposition uses the word little beef. All he says in opposition to summary judgment is, I don't believe I told her street beef, but never, and the district court pointed this out, never says what he thought he told her. So there is no. So it led to a conclusion that it was a physical threat, right? Right. There is nothing in there that says that there was exploration in the deposition as to what was the problem, which led into the discussion about the social media issues and that, but there was nothing put forward by the plaintiff in opposition to summary judgment that said, I told Officer Mays all of these factors to support this claim. Thank you. Thank you. We'll hear from Mr. Padilla for two minutes. Your Honor, I just want to speak to Morgan. Morgan is a case where you have a cooperator who has provided very, very specific detail and has even gone as far as to say, I think I'm going to be attacked at a certain time at a certain place. I think that that goes well beyond where the standard should be. I mean, it's great that the plaintiff in Morgan was able to provide all of that detail, but a person shouldn't have to be able to provide all of that detail. He gave the name of the individual, the gang. He talked about his prior cooperation and the motivation- In Morgan. In Morgan to want to injure him. I think the issue is what was said here. Here, you suggested before that in his deposition, your client said that he told Mays at intake about the Facebook and social media threats. That there had been threats on social media. That was my understanding. I have to say, there was discussion about the nature of the disagreement that your client had with Rooney, but nothing to indicate that that was conveyed to Officer Mays at intake. It may be an issue of fact, Your Honor. Well, I mean, no. It seems to me that there's an absence of fact. And so, I mean, I'll look again at the deposition. Maybe you should as well. But you represented a minute ago, or a few minutes ago, that your client said that he told Mays about the Facebook threats, right? Is that your recollection? I may have misquoted the record. I was relying on the 56.1 statement that referred to telephone and Facebook arguments. But my recollection, having been there, was that he did mention to her, or he did mention in his deposition, that he told her that he had not actually had any physical altercation with Rooney. That the nature of their beef, thus far, had been limited to online threats. That was how I recall it. If I have misstated the record, I apologize. If I may, I wanted to go back to Morgan, though, for a second, because I want to differentiate where, in Morgan, he's not in the intake process being asked by a jail official outright, is there a threat to your safety? He's coming forward and basically asking jail officials to pay attention. In this context, the plaintiff is being asked outright, is there a threat to your safety? For the purpose of determining whether a keep separate order is appropriate. When he gives an affirmative answer, what more does he have to give? And a full name of an individual. He didn't give something vague like, oh, yeah, these guys from such and such street want to beat me up because I have a beef with the guys from that street. Or something like that. Those are the circumstances where I understand threats being vague. Right? When you say, oh, yeah, I don't like the guys from Bedford-Stuyvesant, so I can't be with anybody from Bedford-Stuyvesant. Or something like that. But to give the specific name of an individual, and to say that that individual is in and out of the jail, and I need to be kept separate from that person. I just don't know what more you need to say in order to trigger your constitutional right to be protected. We will reserve the decision. Thank you both. That concludes the arguments on the argument calendar today. We have one other case on submission. We'll reserve on that as well. So let me thank everyone, and let me thank the corporate deputy. Mr. Deere, you may adjourn the court. Court is adjourned. Thank you.